IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**Robocast, Inc.,**

Plaintiff,

v.

Civil Action No. 10-1055-RGA

**Microsoft Corporation,**

Defendant.

## MEMORANDUM ORDER

Before the Court is Plaintiff Robocast, Inc.'s *Daubert* Motion to Exclude the Testimony

of Andrew Schulz and Christopher Martinez (D.I. 337) and related briefing (D.I. 338, 358, 395).

The Court heard oral argument regarding this motion on January 10, 2014. Mr. Schulz is

Defendant's rebuttal expert to Robocast's internet advertising expert, Robert Sherwood.

Robocast contends that Mr. Schulz is not qualified as an expert in internet advertising because

his background is in computer programming, and therefore his testimony should be excluded.

Additionally, Robocast contends that Mr. Schulz cannot testify concerning the scope of the

patent.[1] As for Mr. Martinez, Microsoft's damages expert, Robocast does not object to his

qualifications, but contends that his methodology is unreliable.

Mr. Schulz is by his own admission a professional software engineer. (D.I. 339-2 at 3).

However, this alone does not disqualify him from being an expert in internet advertising. Mr.

Schulz has extensive experience as a software engineer in the field of internet advertising, having

---

[1] Robocast also contends that some of Mr. Schulz's opinions should be excluded because the opinions are irrelevant. Because these arguments concern relevance and FRE 403, they are more properly considered at the *motion in limine* stage.

been the manager of software development at AdKnowledge, one of the first agencies focused on internet advertising. (D.I. 339-4 at 7). More recently, Mr. Schulz consulted for aCerno, a behaviorally targeted advertising network. (D.I. 339-4 at 6). Currently, Mr. Schulz is the general manager of Incentive Networks, an internet advertising firm. (D.I. 339-2 at 4).

It appears that the objection to Mr. Schulz's qualifications is that his experience in internet advertising generally does not qualify him as an expert on the particular CTR and CPM metrics which are currently at issue. For support, Robocast cites to *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316 (3d Cir. 2003), where the court stated, "[a]n expert may be generally qualified but may lack qualifications to testify outside his area of expertise." *Id.* at 322. In *Calhoun*, the plaintiff relied on three experts, all of whom were deemed qualified, but whose testimony was limited. The first expert, a psychologist, was not allowed to testify that as a stress reaction a person would have a tendency to clench his/her hands, but was allowed to testify that because a jet ski throttle is similar to a bicycle brake, a child in a stress reaction would naturally squeeze the throttle. *Id.* The second expert, a lieutenant for San Diego's Marine Safety Services, was not allowed to testify about which particular jet ski throttles were safer, but was allowed to testify about how each type works. *Id.* at 323. The third expert, a marine accident reconstruction consultant, was not allowed to testify that the particular jet ski throttle was unsafe because he had never used the particular throttle, nor had he examined any of the different throttles used on jet skis. *Id.* at 324. None of the District Court's decisions were reversed for an abuse of discretion.

Here, Mr. Schulz has experience in the field of internet advertising, and indeed appears to be familiar with the metrics used within the field. Certainly, Mr. Schulz meets the minimum qualifications necessary to testify as an expert. Internet advertising is not an area with which most jurors are familiar, aside from personal experience viewing those advertisements. While

there may be experts more qualified, Mr. Schulz is qualified enough. To the extent that Robocast

has criticisms of Mr. Schulz's expertise, they go to credibility, and are properly brought up on

cross examination. *See Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997); *In

re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).[2]

As for Mr. Martinez, Robocast has two objections. The first is that Mr. Martinez cannot

rely on the sale of the Tarabella patent because it is not economically comparable. The second is

that Mr. Martinez cannot rely on Robocast's valuation because he was unaware of certain factors

underlying the valuation. Neither argument is persuasive.

Robocast's issue with the use of the Tarabella sale seems to be based on the argument

that in addition to technological comparability, there must be economic comparability of the

value of the technology. This is circular. The reason that technological comparability is required

is that there is an assumption that similar technologies are similarly valued. One cannot know

beforehand whether similar technologies will have the same economic impact. What the parties

to the Tarabella patent sale expected is unknown, but what has actually happened as a result of

the technology at issue can be evaluated and taken into account as a *Georgia Pacific* factor.

Robocast appears to conflate the idea of economic comparability with economic value of

the patent. But economic comparability applies to the specifics of the transaction, because

specifics such as exclusivity and geographic scope affect the price a party is willing to pay. The

Tarabella sale was not a license agreement, but an outright sale of patent rights. Thus it

represents the maximum value someone was willing to pay for the technology. If anything, this

---

[2] With regard to Robocast's objection that Mr. Schulz not be allowed to testify regarding the scope of the claims asserted in this case, this subject is indeed outside Mr. Schulz's area of expertise. The Court understands that Mr. Schulz bases his opinions regarding claim scope solely on the opinions of Professor Horowitz and Dr. Almeroth, and offers no opinions of his own. Mr. Schulz may discuss the purported lack of fit between Mr. Sherwood's testimony and the technology at issue, but may not give his personal opinions about the scope of the asserted claims. This includes stating whether he agrees with either or both of Professor Horowitz and Dr. Almeroth.

type of transaction overstates the value which Microsoft would place on a license for comparable technology. It nevertheless serves as a relevant data point in determining the value which the parties to the hypothetical negotiation would place on technologically similar patents, in this case the Robocast patent at issue.

Robocast's issue with the use of the valuation is that Mr. Martinez was unaware of any discounts applied due to uncertainty, such as the risk of invalidity.[3] Therefore, Robocast contends that Mr. Martinez could not have applied the required assumption that the patent in suit be deemed valid and infringed.[4] As an initial matter, Mr. Martinez noted that his damages conclusion was likely on the high end of the reasonable royalty range (D.I. 339-5 at 42), and that statements made by Robocast implied that the company subjectively thought the patent was valid and infringed. *Id.*

Even if this were not the case, there is no basis for excluding Mr. Martinez's testimony regarding the valuation. Lump sum licenses are frequently made in the absence of certainty regarding infringement and validity, and yet they inform the reasonable royalty calculation. Of course, it may also be proper to adjust the reasonable royalty upwards due to this uncertainty. *See Mondis Tech., Ltd. v. LG Electronics, Inc.*, 2011 WL 2417367, at *4 (E.D. Tex. June 14, 2011) (allowing tripling of standard royalty rates to account for uncertainty); *See also ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) ("[A] reasonable royalty may permissibly reflect the fact that an infringer had to be ordered by a court to pay damages rather than agreeing

---

[3] The Robocast "valuation" was Robocast's estimation of its own worth at or near the time of the hypothetical negotiation. Mr. Martinez's analysis is fairly straightforward. Robocast's only asset was the '451 patent. Robocast believed a number of companies infringed the patent. Microsoft accounted for 3 to 6% of the relevant market using the technology. Thus, the value of Microsoft's infringement was, by that calculation, 3 to 6% of Robocast's value. Additionally, Mr. Martinez noted that Robocast had identified 5 initial litigation targets and later increased that number to 11 targets. At the most, then, assuming an expectation of equal judgments from the five litigation targets, the value of Microsoft's infringement was one fifth of Robocast's value.

[4] Mr. Martinez stated that he applied the required assumption of validity and infringement. (D.I. 339-5 at 41).

to a reasonable royalty.") (internal quotation marks omitted); *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 900 (Fed. Cir. 1986) ("That [the patentee] might have agreed to a lesser royalty is of little relevance, for to look only at that question would be to pretend that infringement never happened. It would also make an election to infringe a handy means for competitors to impose a compulsory license policy upon every patent owner.") (internal quotation marks and citations omitted).

While there is a question regarding the discounts applied to the valuation, the valuation itself should not be excluded. Robocast even cites to *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336 (Fed. Cir. 2011), which lends support for this proposition. There, the patent at issue was sold prior to suit, and while the patentee "hoped that the patent would survive any challenge to its validity, [it] did not really know for certain, and it could not really know for certain without paying millions of dollars in legal fees to launch lengthy and risky litigation." *Id*. at 1347. There, as here, the value assigned to the sale would have reflected a discount, but "[t]he district court observed that the weight to be given to this aspect was a task for the jury." *Id*. Accordingly, it is up to the jury to determine the weight accorded the valuation. Robocast may properly bring up the valuation discount on cross examination.

Plaintiff's motion (D.I. 337) is hereby **DENIED**.

Entered this 16th day of January, 2014.

United States District Judge